**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| MELMARK, INC., | : | No. 78 MAP 2017 |
| | : | |
| Appellant | : | Appeal from the Order of the Superior |
| | : | Court at No. 2253 EDA 2016 dated |
| | : | 8/21/17, affirming the judgment of the |
| v. | : | Court of Common Pleas Delaware |
| | : | County, Civil Division, at No. 13-1572 |
| ALEXANDER SCHUTT, AN | : | entered 6/24/16 |
| INCAPACITATED PERSON, BY AND | : | |
| THROUGH CLARENCE E. SCHUTT AND | : | |
| BARBARA ROSENTHAL SCHUTT, HIS | : | |
| LEGAL GUARDIANS, AND CLARENCE | : | |
| E. SCHUTT AND BARBARA | : | |
| ROSENTHAL SCHUTT, INDIVIDUALLY, | : | |
| | : | |
| Appellees | : | ARGUED: December 4, 2018 |

## OPINION

**CHIEF JUSTICE SAYLOR**                    **DECIDED: April 26, 2019**

This matter arises due to the failure of a New Jersey couple to pay for their adult son's stay at a Pennsylvania nonprofit residential facility. It primarily raises a choice-of-law issue in relation to the two states' filial-support statutes.

### I. Background

Alexander Schutt ("Alex"), born in 1986, is an individual with severe mental and physical disabilities, including autism and obsessive-compulsive disorder. He exhibits maladaptive behaviors such as extreme aggression, noncompliance, elopement, and pica (eating non-food items). Alex cannot care for himself and requires continual one-on-one assistance with the activities of daily life including toileting, bathing, medication

management, recognizing dangerous situations, behavioral issues, and mobility issues. He suffers from grand mal seizures during which oxygen is often administered. He has received Medicaid and Social Security Disability benefits since 2004.

Alex's parents, appellees Dr. Clarence Schutt and Barbara Schutt ("Parents"), born in 1945 and 1947, respectively, live in Princeton, New Jersey. They were appointed as Alex's guardians in 2004. They have both been at least 55 years old at all relevant times. There is no suggestion that they lack the ability to support Alex.[1]

In 2001, Alex was placed at Melmark, a non-profit residential care facility for intellectually and physically disabled persons, located in Delaware County, Pennsylvania. Melmark is owned and operated by appellant Melmark, Inc., a Pennsylvania nonprofit corporation. During his stay there, Alex received residential, educational, and vocational services. While Alex was under 21, his costs were paid by the Princeton Regional School District. Starting in July 2007, Alex was no longer entitled to school district funding. At that point, responsibility for the cost of Alex's care shifted to the New Jersey Department of Human Services, Division of Developmental Disabilities ("NJ-DDD"). Also at that time, Alex began attending Melmark's adult residential program, which included residential and vocational services.

In July 2011, NJ-DDD informed Parents that Alex would have to be relocated on August 7, 2011, because the agency disapproved Melmark's rates. NJ-DDD stated that Parents, as guardians, should pick Alex up at Melmark and NJ-DDD would provide him with an emergency placement pursuant to New Jersey law. Parents did not retrieve Alex from Melmark on that date, however. Thereafter, in December 2011, NJ-DDD wrote to Parents, stating it would fund Alex's residence on a permanent basis at an

---

[1] According to the record, for the 2009-2011 timeframe Parents' gross income was approximately $1,800,000, and they expected to receive income in excess of $570,000 in 2014. They also own a retirement account valued at $1,400,000.

identified facility in New Jersey beginning on January 16, 2012. Unsatisfied with this offer, Parents asked NJ-DDD instead to continue paying for Alex's care at Melmark. NJ-DDD disapproved that request and advised Parents it would cease paying Melmark as of December 31, 2011. Parents lodged an administrative appeal in New Jersey in an effort to keep Alex at Melmark. NJ-DDD granted extensions of time to allow for Alex's transfer to a New Jersey facility, but the agency ultimately informed Parents it would make no further payments to Melmark after March 31, 2012.

When that date arrived, neither Parents nor NJ-DDD accepted custody of Alex, leaving Melmark to care for him uncompensated. Nevertheless, Parents continued to pay for off-campus speech classes, art classes, and equestrian therapy for Alex, all of which took place in Pennsylvania. In addition, Parents continued to visit Alex at Melmark almost every weekend even after NJ-DDD's payments ceased. *See, e.g.*, N.T. July 21, 2014, at 23 (reflecting Mrs. Schutt's deposition testimony to this effect).

In August 2012, Parents filed an "Application for Emergent Relief" in New Jersey, requesting restoration of New Jersey state funding for Alex's care at Melmark pending the outcome of their administrative appeal. Meanwhile, Melmark filed a petition in the Delaware County common pleas court, requesting a determination that Alex needed placement for residential care as an incapacitated person. *See* 50 P.S. §4406; 55 Pa. Code §6250.11. Parents appeared and opposed Melmark's petition, representing that Parents and NJ-DDD were involved in a mere funding dispute over Alex's care. The court denied relief on that basis, noting that the funding dispute might be resolved at a New Jersey hearing scheduled for January 2013 concerning Parents' administrative appeal. *See In re Involuntary Commitment of Alexander Schutt*, No. 456 of 2012, *slip op.* at 4 (C.P. Delaware Nov. 15, 2012), *appeal dismissed as moot*, *In re A.S.*, No. 3365 EDA 2012, 2013 WL 11255021 (Pa. Super. Aug. 23, 2013).

Thereafter, on December 21, 2012, Parents voluntarily withdrew their New Jersey administrative appeal, causing the January 2013 hearing to be cancelled. This development eliminated any opportunity Parents had previously alleged was available to obtain an adjudication requiring NJ-DDD to pay Melmark for its services to Alex.[2]

Alex continued to live at Melmark until May 15, 2013, when Melmark transported him to a crisis center in New Jersey due to his increasingly aggressive behaviors.[3] Thus, Melmark provided uncompensated residential and day program services to Alex from April 1, 2012, to May 14, 2013. Melmark and the trial court calculated the cost of these services at approximately $205,000.00.

Melmark filed a complaint in the Delaware County Court of Common Pleas, seeking recovery of the cost of services as outlined above. In Counts I and II of the complaint, Melmark asserted equitable claims under the doctrines of unjust enrichment and *quantum meruit*. In Count III, Melmark included a cause of action based on Pennsylvania's common law and filial support statute. That statute provides:

> **(a) Liability.–**
>
> (1) Except as set forth in paragraph (2), all of the following individuals have the responsibility to care for and maintain or financially assist an indigent person, regardless of whether the indigent person is a public charge: (i) The spouse of the indigent person. (ii) A child of the indigent person. (iii) A parent of the indigent person.

---

[2] Alex's father admitted in a deposition that his overall goal was for Alex to remain at Melmark free of charge for the rest of Alex's life. He also stated he felt no responsibility as a parent to supply even partial payments to Melmark, as he believed that Alex's residence and services at Melmark should instead be publicly funded. *See* N.T., July 21, 2014, at 36-39, 89-90.

[3] *See* N.T., Jan. 12, 2016, at 23-25 (reflecting testimony of a Melmark employee describing Alex's violent behaviors). After a brief stay at the New Jersey crisis center, Alex was moved to, and has received care and services at, a facility in New Jersey, with NJ-DDD paying the cost.

(2) Paragraph (1) does not apply in any of the following cases: (i) If an individual does not have sufficient financial ability to support the indigent person. . . .

**(b) Amount.–**

(1) [With certain exceptions], the amount of liability shall be set by the court in the judicial district in which the indigent person resides.

* * *

**(c) Procedure.–**A court has jurisdiction in a case under this section upon petition of:

(1) an indigent person; or

(2) any other person or public body or public agency having any interest in the care, maintenance or assistance of such indigent person.

* * *

23 Pa.C.S. §4603(a)-(c).

In their amended new matter, Parents averred that the court should apply New Jersey's filial support statute, not Pennsylvania's. Parents posited that, under such law, liability is limited to individuals less than 55 years old unless the indigent person is the party's spouse or minor child. The substantive aspect of the New Jersey statutory scheme provides, in relevant part:

**44:1-139. Obtaining or compelling assistance of relatives**

Upon application for the relief of a poor person [a municipal director of welfare] shall ascertain if possible the relatives chargeable by law for his support and proceed to obtain their assistance or compel them to render such assistance as is provided by law.

**44:1-140. Relatives chargeable**

a. The father and mother of a person under 18 years of age who applies for and is eligible to receive public assistance, and the children, and husband or wife, severally and respectively, of a person who applies for

and is eligible to receive public assistance, shall, if of sufficient ability, at his or their charge and expense, relieve and maintain the poor person or child in such manner as shall be ordered, after due notice and opportunity to be heard, by any county or municipal director of welfare, or by any court of competent jurisdiction upon its own initiative or the information of any person.

* * *

c. The provisions of this section shall not apply to any person 55 years of age or over except with regard to his or her spouse, or his or her natural or adopted child under the age of 18 years.

**44:1-141. Compelling support by relatives**

If any of the relatives mentioned in section 44:1-140 of this Title shall fail to perform the order or directions of the director of welfare of a municipality with regard to the support of the poor person, or if the poor person is supported at public expense, the Superior Court in the county wherein the poor person has a legal settlement, or the municipal court of the municipality wherein the person has a legal settlement, upon the complaint of the director of welfare or two residents of the municipality or county may summon the persons chargeable before it as in other actions, summon witnesses, and adjudge that the able relatives pay such sum for each poor person as the circumstances may require in the discretion of the court, and as will maintain him or them and relieve the public of that burden. . . . Any child now under an order to support a poor person may apply to the court which issued said order for the revocation or reduction of said order in accordance with the terms of this proviso. Violation of any such order shall constitute a contempt of court.

The county through its governing body may also bring appropriate action in any court of competent jurisdiction to recover any money due for the relief, support and maintenance of a poor person against a person chargeable by law therefor.

N.J.S. §§44:1-139, 44:1-140(a), (c).

A bench trial was held on January 12, 2016. At the trial, a Melmark employee testified and the parties entered joint stipulations of fact. The court ruled in favor of Parents on the statutory claim. In its Rule 1925(a) opinion, the court initially observed that Pennsylvania's filial support statute specifies that the amount of liability is to be set

by the court in the judicial district in which the indigent person "resides." 23 Pa.C.S. §4603(b)(1). It noted that, per the stipulation, Alex was a New Jersey "resident" at all relevant times. Thus, the court concluded that Alex "reside[d]" in New Jersey during such times, with the consequence that it lacked the ability to set the amount of liability. *Melmark, Inc. v. Schutt*, No. 13-001572, *slip op.* at 15 (C.P. Delaware Sept. 16, 2016).[4]

Assuming, *arguendo*, that the court could set liability, it undertook a choice-of-law analysis, stating that: (a) a conflict exists between the Pennsylvania and New Jersey statutes; (b) the New Jersey statute would relieve Parents of liability since they were over 55 and Alex was over 18; and (c) pursuant to the considerations in Section 6 of the Second Restatement of Conflict of Laws, as endorsed in *Gillian v. Gillian*, 345 A.2d 742, 744 (Pa. Super. 1975) (citing *Griffith v. United Air Lines, Inc.*, 416 Pa. 1, 203 A.2d 796 (1964)), New Jersey had the greater interest in the issue, giving its laws primacy.[5] In

---

[4] Although the parties may have stipulated he was a "resident" of New Jersey – at least for purposes of his entitlement to receive public welfare benefits – that alone does not preclude his simultaneously having resided in Delaware County for Section 4603(b)(1) purposes. Notably, "while a person can have only one domicile, he can be a resident of multiple places at the same time." *Vento v. Dir. V.I. Bureau of Internal Revenue*, 715 F.3d 455, 467 (3d Cir. 2013); *see In re Residence Hearing Before Bd. of Sch. Dirs.*, 560 Pa. 366, 371, 744 A.2d 1272, 1275 (2000) (distinguishing the terms "domicile" and "residence," noting that the former is a fixed, permanent home, while the latter only refers to a person's "physical presence in a particular place" (internal quotation marks and citation omitted)). *See generally* BLACK'S LAW DICTIONARY 1308 (6th ed. 1990) (defining "reside" as to live, dwell, abide, sojourn, stay, remain or lodge in a particular place). As it is undisputed that Alex lived at Melmark during the relevant period, the trial court erred in this regard.

[5] The factors listed in that aspect of the restatement include: the needs of the interstate and international systems; the relevant policies of the forum; the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue; the protection of justified expectations; the basic policies underlying the particular field of law; certainty, predictability and uniformity of result; and ease in the determination and application of the law to be applied. *See* REST. (SECOND) CONFLICT OF LAWS §6(2).

this latter regard, the court expressed that, while New Jersey requires parents to support their indigent children, its statute reflects a policy to relieve older parents of such liability.

The court also recited that Alex and Parents were from New Jersey and NJ-DDD was the party supplying funding – at least until Parents refused to take custody of Alex on March 31, 2012. Moreover, during the time such funds were provided, the court explained, Alex contributed most of his Social Security disability benefits to NJ-DDD as partial indemnification. By contrast, Pennsylvania's only interest in the litigation, in the court's view, was to ensure that a Pennsylvania private institution received compensation for services rendered. Finally, although Parents selected a Pennsylvania facility for Alex, visited him there, and paid for horseback lessons, speech classes, and art lessons in Pennsylvania, the court did not view the quantity and quality of these contacts as significant. *See Schutt*, No. 13-001572, *slip op.* at 18-21.

Separately, as to the claims based on unjust enrichment and *quantum meruit*, the trial court found for Melmark and against Alex, by and through his parents *as legal guardians*. However, it found in favor of Parents *individually* on these counts, meaning that Melmark could not obtain compensation on such theories because Alex is indigent. The court reasoned both theories depended on the existence of a quasi-contract – that is, a contract implied in law. It continued that, to recover, the plaintiff must show that benefits were conferred on the defendant and the defendant appreciated them. The court stated any benefits conferred by Melmark on Parents were appreciated by them only in their capacity as Alex's guardians, and not individually, since Parents had no individual legal obligation to support Alex. *See id.* at 21-22.

On appeal, Melmark argued that the trial court erred in several respects. First, it stated that Alex clearly resided at its facility in Delaware County, and that the common

pleas court assumed as much because it set the amount of liability. Second, Melmark contended that the court should not have engaged in a choice-of-law analysis, as there was no conflict to resolve. Specifically, Melmark advanced that the New Jersey statute has no present application as it only pertains to the ability of a government official to seek contribution from family members of an indigent person so as to relieve New Jersey taxpayers of some of the burden. Melmark pointed out that, during the period in question, no government entity was paying for Alex's services at Melmark. Third, even under a choice-of-law analysis, Melmark argued, Pennsylvania enjoys a stronger interest as its filial-support law is designed, *inter alia*, to ensure that Pennsylvania facilities providing care to indigent persons receive payment. Melmark contended that such purpose was especially significant since Parents took steps to prolong Alex's stay at Melmark after NJ-DDD stopped paying Melmark. Fourth, Melmark challenged the trial court's denial of relief on its unjust enrichment and *quantum meruit* claims.

The Superior Court affirmed in a published opinion. *See Melmark, Inc. v. Schutt*, 169 A.3d 638 (Pa. Super. 2017).[6] The court first addressed Melmark's claim that the New Jersey statute does not apply. It reasoned that, although the entity now seeking reimbursement (Melmark) is private, New Jersey's statutory scheme reflects a generalized policy to protect elderly parents "from financial liability associated with the provision of care for their public assistance-eligible indigent adult children." *Id.* at 643. The court deemed the purpose especially salient here because Parents had depended on New Jersey payments to Melmark for many years and they had "made sincere efforts to secure appropriate replacement services once New Jersey and [Melmark] could no longer agree on payment terms." *Id.* In terms of the appropriate choice of law,

---

[6] The Superior Court initially filed a memorandum decision. It later granted Parents' request that the decision be published. *See* Pa.R.A.P. 3519(b).

the intermediate court endorsed the trial court's conclusion that New Jersey had a greater interest in the litigation than Pennsylvania. *See id.* at 644. Finally, the Superior Court adopted the trial court's reasoning with respect to the claims based on unjust enrichment and *quantum meruit.* *See id.* at 645.

We granted Melmark's petition for allowance of appeal, which raised issues concerning whether a conflict exists between New Jersey and Pennsylvania law, which state's law should apply in the event of a conflict, and whether Melmark is otherwise entitled to relief on its equitable claims. *See Melmark v. Schutt*, ___ Pa. ___, ___, 176 A.3d 853, 854 (2017) (*per curiam*).[7]

## II. Choice of law

### A. True conflict

Courts conduct a choice-of-law analysis under the choice-of-law rules of the forum state. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S. Ct. 1020, 1021 (1941); *Griffith v. United Airlines*, 416 Pa. 1, 21, 203 A.2d 796, 805 (1964). Pennsylvania courts first consider whether a "true conflict" exists between the two states. *Keystone Aerial Surveys, Inc. v. Pa. Prop. & Cas. Ins. Guar. Ass'n*, 574 Pa. 147,

---

[7] Although Parents submitted a no-answer letter in response to Melmark's petition for allowance of appeal, they now maintain that the petition was untimely, and hence, this appeal was improvidently granted. Parents argue that Melmark filed its petition on August 24, 2017, more than 30 days after the Superior Court's original order included with its memorandum decision, *see supra* note 6, which was filed on July 19, 2017. *See* Brief for Appellees at 1-2; Pa.R.A.P. 1113(a) (generally requiring that a petition for allowance of Appeal be filed within 30 days of the intermediate court order "sought to be reviewed"). Parents overlook, however, that the Superior Court filed an order on August 18, 2017, affirmatively withdrawing its July 19, 2017, memorandum and order. The intermediate court subsequently replaced the memorandum decision with a new, published opinion and order dated August 21, 2017. It is this latter order which is "sought to be reviewed" for Rule 1113(a) purposes. Consequently, Melmark's petition was timely as it was filed within 30 days of August 21, 2017.

153, 829 A.2d 297, 301 (2003); *accord Sheard v. J.J. DeLuca Co.*, 92 A.3d 68, 76 (Pa. Super. 2014) (quoting *Budtel Assoc's, LP v. Cont'l Cas. Co.*, 915 A.2d 640, 643 (Pa. Super. 2006)). This is because in some instances the purported conflict is ultimately revealed to be a "false conflict" – meaning that the laws of both states would produce the same result, *see Titeflex Corp. v. Nat'l Union Fire Ins. Co.*, 88 A.3d 970, 979 (Pa. Super. 2014) (quoting *Williams v. Stone*, 109 F.3d 890, 893 (3d Cir. 1997)), or that one of the states has no meaningful policy-based interest in the issue raised. *See, e.g.*, *Kuchinic v. McCrory*, 422 Pa. 620, 624 & n.4, 222 A.2d 897, 899-900 & n.4 (1966) (citing cases). *See generally Commonwealth v. Eichinger*, 591 Pa. 1, 21 n.17, 915 A.2d 1122, 1134 n.17 (2007) (discussing false conflicts).

Presently, Melmark renews its argument that New Jersey's filial support law does not apply in the circumstances, as it merely allows a public official to seek contribution from family members of an indigent person who receives public assistance funds, which Alex was not receiving for his care at Melmark during the period at issue. Melmark contends that Pennsylvania's filial support statute, 23 Pa.C.S. §4603 (quoted above), reflects a broader legislative intent that Pennsylvania facilities caring for indigent persons be compensated for their services by immediate family members where that is reasonably possible. Thus, Melmark concludes, no true conflict between Pennsylvania and New Jersey law exists so as to implicate a choice-of-law assessment, with the result that Pennsylvania's filial support law is the only statute applicable to the underlying facts.

Parents respond that, because New Jersey's and Pennsylvania's filial support statutes dictate support obligations as between family members, they have the same underlying purpose to protect the poor and indigent by mandating support from certain defined relatives. They also dispute Melmark's contention that New Jersey's statute

only relates to a governmental interest in obtaining reimbursement for the expenditure of public funds on the care of an indigent person. They suggest, for example, that the indigent person himself, or two residents of the county or municipality where the indigent person resides (such as two employees of a residential care facility), can seek support from chargeable relatives without reference to indemnification for a New Jersey public agency. *See* Brief for Appellees at 16 (citing N.J.S. §44:1-141).

The way in which the laws of a foreign jurisdiction operate presents a question of law, *see* 42 Pa.C.S. §5327(c), which we review *de novo*. *See Discovery Charter Sch. v. Sch. Dist. of Phila.*, 641 Pa. 136, 143, 166 A.3d 304, 308 (2017). We may take judicial notice of New Jersey statutory provisions and reported judicial decisions. *See* 42 Pa.C.S. §5327(b); Pa.R.E. 201(b); *Astrin v. Metropolitan Life Ins. Co.*, 341 Pa. 120, 125 n.2, 17 A.2d 887, 889 n.2 (1941).

The parties refer to few if any reported New Jersey decisions interpreting the relevant aspects of that state's filial support statute. Melmark's position is not without some basis: the enforcement provision applicable when chargeable relatives fail to provide the required support allows for a court order directing the payment of "such sum . . . as the circumstances may require . . . and as will maintain him or them *and relieve the public of that burden*." N.J.S. §44:1-141 (emphasis added). As we read the statutory text, however, it appears to impose a generalized obligation on certain family members to support an indigent relative, as does the Pennsylvania statute. The first sentence of Section 44:1-141, for instance, indicates enforcement can be invoked when chargeable relatives fail to perform their duties as required by an order or directive of a municipal welfare director, "*or* if the poor person is supported at public expense." *Id.* Use of the word "or" suggests the enforcement mechanism may be used in circumstances other than when the indigent person is publicly supported, and indeed a

separate basis for its invocation to obtain indemnification for state agency expenses appears in the second paragraph of Section 44:1-141.

These aspects of the law suggest that the statutory phrase relating to "reliev[ing] the public of [the] burden" was meant to be understood in the general sense that the public in some unspecified way would otherwise have to support a person who cannot support himself, and that it was not intended specifically as a reference to indemnification of government welfare agencies for expenses already incurred. Further, at least one New Jersey court has applied Section 44:1-140 in the absence of any allegation that the indigent person had been receiving, or would ultimately receive, support from such an agency. *See Pavlick v. Teresinski*, 149 A.2d 300 (N.J. Juv. & Dom. Rel. Ct. 1959); *cf. Pennhurst State Sch. v. Goodhartz' Estate*, 200 A.2d 112, 114 (N.J. 1964) (referring to a policy common to Pennsylvania and New Jersey favoring the imposition of responsibility on financially able parents to maintain their incompetent children in state institutions).

In light of the above, we believe that the New Jersey statute would apply to Parents but for the age-55 exemption. This, in turn, suggests New Jersey has a meaningful policy-based interest in the issue raised. How strong that interest is under the circumstances, in comparison with Pennsylvania's competing interest, is a matter for the next phase of the analysis, in which a choice of law is made. Finally, the laws of Pennsylvania and New Jersey would not produce the same outcome.

Accordingly, we conclude that a true conflict exists thereby necessitating an assessment, under choice-of-law principles, of which state's law should be applied to the facts of this case.

## B. Applicable law

Melmark suggests Pennsylvania's filial-support law should be applied instead of New Jersey's, given the Commonwealth's interest in ensuring that facilities which care for indigent persons in Pennsylvania are able to look to designated family members to obtain compensation for the provision of essential services. Melmark indicates this interest is especially pronounced here because Alex's "wealthy parents" "knowingly abandon[ed]" their indigent son "in Pennsylvania with no form of support." Brief for Appellant at 25, 31. Further, Melmark proffers that all relevant events occurred in Pennsylvania and, as a Pennsylvania non-profit institution, Melmark was entitled to rely on Pennsylvania law when it provided care to Alex. Thus, Melmark argues, even if New Jersey law would otherwise give more protection to Parents than Pennsylvania's filial support statute for actions occurring in New Jersey, Pennsylvania has a stronger interest in the matter under the present facts.

Melmark also emphasizes that Parents could have moved Alex to a New Jersey facility, where NJ-DDD would have resumed paying for Alex's care and residence, or continued with their efforts to compel NJ-DDD to pay Melmark. Instead, Melmark argues, Parents took steps, including manipulating the legal systems of both states, to keep Alex in Pennsylvania. According to Melmark, Parents did this because they wanted Melmark to be Alex's lifelong home where he could live free of charge. Under this scenario, Melmark offers that Pennsylvania's policy favoring family-supplied compensation for the care of indigent persons should predominate. *See id.* at 30-42.

Parents counter that New Jersey has the basic responsibility for establishing and regulating the support obligations of its citizens. They suggest that the choice-of-law question should be viewed as solely involving the relationships among family members. *See* Brief for Appellees at 19-22 (citing *McSwain v. McSwain*, 420 Pa. 86, 215 A.2d 677

(1966) (where an automobile accident involving Pennsylvania citizens occurred in Colorado, applying Pennsylvania law generally precluding interspousal lawsuits, although the suit would have been permitted under Colorado law)). Employing traditional choice-of-law factors, such as which state has the most significant contacts or relation to the action and the protection of justified expectations, Parents emphasize that Parents and Alex were New Jersey citizens at all times and that Parents reasonably expected to be relieved of any obligation to support Alex inasmuch as he was no longer a minor and they were over 55 years old. By contrast, Parents characterize Pennsylvania's interest in this litigation as less weighty as it solely involves the ability of a private institution to be paid for services rendered.

Parents assert, as well, that requiring them to make support payments under Pennsylvania law, when New Jersey exempts its citizens over the age of 55 from such liability, would violate their equal protection rights. For support, they reference *Pennsylvania, Department of Public Assistance v. Mong*, 117 N.E.2d 32 (Ohio 1954), a dispute in which an indigent father living in Pennsylvania sought support from a son whom he had abandoned while the son was under 16 years old, and who was living in Ohio at the time of the litigation. Ohio's statute relieved the son of obligations toward his father due to the abandonment, whereas Pennsylvania's did not. The court applied Ohio law on the grounds that it would violate equal protection not to allow him to avail himself of Ohio's protections solely because the father was from Pennsylvania. Parents interpret *Mong* as indicating that the law of the state where the alleged obligor lives – here, New Jersey – should control. *See* Brief for Appellees at 26.

Finally, Parents take exception to any suggestion that they manipulated the legal systems of Pennsylvania and New Jersey. They maintain that they only discontinued their administrative appeal in New Jersey when NJ-DDD agreed that Melmark was a

better location for Alex than the specific named facility in New Jersey for which NJ-DDD was willing to pay.

States formerly applied the *lex loci delicti*, or "place of injury," rule, under which the law of the state where the injury occurred would be applied. *See* 16 AM. JUR. 2D *Conflict of Laws* §108. Pennsylvania, like a majority of other states, has abandoned this rule in favor of a litmus framed in terms of which state has the most significant relationship to the occurrence and the parties. *See Griffith*, 416 Pa. at 21, 203 A.2d at 805; *Shuder v. McDonald's Corp.*, 859 F.2d 266, 269-70 (3d Cir. 1988); *Ramey v. Wal-Mart, Inc.*, 967 F. Supp. 843, 844 (E.D. Pa. 1997). *See generally* 6 AM. JUR. 2D *Conflict of Laws* §§3, 111. The overriding consideration is which state has "a priority of interest in the application of its rule of law" so as to vindicate the policy interests underlying that law. *McSwain*, 420 Pa. at 94, 215 A.2d 682 (citing *Griffith*, 416 Pa. at 15, 21-22, 203 A.2d at 802, 805). Because of the focus on competing policies, such analysis tends to be fact-sensitive. *See id.* ("Whether the policies of one state rather than another should be furthered in the event of conflict can only be determined within the matrix of specific litigation.").

We first consider which parties are affected by the choice of the appropriate law to apply. Because Parents discontinued their administrative appeal in New Jersey, NJ-DDD will not be obligated to pay for Alex's stay at Melmark during the time period in question regardless of our ruling. Therefore, the only parties affected by the resolution of this appeal are Parents and Melmark. As the litigants are evenly split between New Jersey and Pennsylvania, we do not discern that either state has a more significant relationship to the parties.

With that said, all of the relevant actions took place in Pennsylvania, as that is where Melmark provided residential services and specialized care to Alex for which it

now seeks compensation – and that is also where Parents ensured that Alex would continue to live by failing to take custody of him on March 31, 2012, when they were aware that NJ-DDD would stop paying Melmark. Furthermore, since Alex lived and received services in Pennsylvania at all relevant times, Melmark could justifiably expect that, pursuant to Section 4603 of the Domestic Relations Code, 23 Pa.C.S. §4603, his responsible family members would pay for his care upon the cessation of funding from an extrinsic source such as the Princeton Regional School District or NJ-DDD.

Parents seek to diminish this factor's importance by emphasizing that Alex is originally from New Jersey and had New Jersey domiciliary status at the time in question, as reflected by NJ-DDD's willingness to pay for his placement at a New Jersey facility. As noted, Parents analogize this circumstance to that in *McSwain*, which determined that the location of the accident was less important than the fact that both spouses were from Pennsylvania – meaning that the Commonwealth's policy precluding one spouse from recovering against the other on a negligence claim predominated over Colorado's interest in incentivizing careful driving on its roadways.

The analogy is unavailing, however, as in *McSwain* neither party was from Colorado and the site of the accident was fortuitous. Thus, application of Colorado law would have had at most an attenuated ability to effectuate that state's policy objectives relating to roadway safety. In this case, however, the plaintiff is a Pennsylvania non-profit entity which relies, at least in part, on support from close relatives when it provides residence and care for an indigent person. This gives Pennsylvania a strong interest in seeing its filial-support law applied so that institutions supplying such care can continue to fulfill that vital societal function without incurring unremunerated costs or seeking to shift them to Pennsylvania taxpayers through involuntary commitment proceedings, as Melmark sought to do here once it was no longer being compensated.

Although Pennsylvania has abandoned the *lex loci delicti* rule, moreover, it does not follow that the location of the harm is unimportant. Four years after *Griffith* was decided, this Court issued *Cipolla v. Shaposka*, 439 Pa. 563, 267 A.2d 854 (1970), in which a Pennsylvania citizen was injured in a roadway accident in Delaware while riding in an automobile driven by a Delaware citizen. Delaware law barred recovery under its "guest-host" rule whereby a guest could not recover for his host's negligence, a rule that did not exist in Pennsylvania. *See id.* at 564-65, 267 A.2d at 855. The plaintiff sought application of Pennsylvania law. However, this Court applied Delaware law, explaining that, "[b]y entering the state . . ., the visitor has exposed himself to the risk of the territory and should not subject persons living there to a financial hazard that their law had not created." *Id.* at 567, 67 A.2d at 856 (internal citations and quotation marks omitted). The Court continued:

> Inhabitants of a state should not be put in jeopardy of liability exceeding that created by their state's laws just because a visitor from a state offering higher protection decides to visit there. . . . To withdraw . . . actions and affairs from the reach of domestic law because the persons (or at least one of the persons) participating in them are not domestic to the state causes a wrench away from customary attitudes towards law . . ..

*Id.* at 567, 67 A.2d at 856-57 (second ellipsis in original, internal citations and quotation marks omitted).

Here, Alex was transported, with Parents' consent, to Pennsylvania to reside and obtain services from a Pennsylvania-based facility. As such, this case is analogous to *Cipolla* in the sense that Parents, in effect, seek to carry their own, more protective, law with them into a foreign jurisdiction (Pennsylvania) and have it applied relative to a legal entity (Melmark) situated and operating in that jurisdiction. In the terms set forth in *Cipolla*, Melmark "should not be put in jeopardy" of shouldering uncompensated costs exceeding those they would incur under Pennsylvania law "just because a visitor from a

state offering higher protection [for older parents] decides to" place a child at its Pennsylvania facility. *Id.*[8]

We do not deny that New Jersey has a substantial competing interest in fulfilling its policy of exempting parents over 55 years old from support obligations relative to their adult children. In relation to this specific dispute, however, the force of that interest is diminished for two reasons. First, NJ-DDD took steps to ensure that Parents would not have to pay for Alex's support, as it offered to place Alex in a New Jersey facility at public expense. New Jersey thus acted pursuant to its public policy, and that policy could have been effectuated had Parents accepted NJ-DDD's offer.

Second, and more important, the course of conduct in which Parents engaged would, by their admission, result in an unrelated private party (Melmark) bearing the cost of providing for their indigent son's care for the remainder of his life. In this respect, although New Jersey's welfare laws apparently provide for Alex's support at public expense, there is no reason to suppose that New Jersey has adopted a public policy favoring imposition of the ongoing cost of care for indigent adults on an *unwilling private third party*. By contrast, Pennsylvania plainly has a strong interest in ensuring that relatives do not leave their disabled family members at private Pennsylvania facilities in such a way that those facilities are forced to incur substantial uncompensated expenses on an indefinite basis – an interest which is reflected in 23 Pa.C.S. §4603. Under such a scenario, the exemption in New Jersey's statutory filial-support law for parents over 55 years of age cannot justifiably override Pennsylvania's

---

[8] Parents' reliance on the *Mong* decision does not advance their position. Although no constitutional issue is before this Court, the equal protection analysis set forth in that matter would, if applied here, suggest that Melmark could not be deprived of the benefit it would otherwise enjoy under Pennsylvania's filial support statute solely because a similar protective benefit is withheld from service providers pursuant to New Jersey law under the circumstances, *i.e.*, where the parents are over 55 years old.

governing statute – at least for the period from April 1, 2012 to May 15, 2013 – so that the financial burden for Alex's care falls upon Melmark.

In light of the foregoing, we conclude that Pennsylvania has the stronger interest in applying its law within the framework of this controversy. Accordingly, we will reverse the judgment of the Superior Court insofar as it directed to the contrary, and remand for application of Pennsylvania law as to Count III of the complaint.

### III. Equitable claims

Having resolved the choice-of-law issue, we now turn to Melmark's claims sounding in *quantum meruit* and unjust enrichment.[9]

Where work has been done or services provided, a "claim for damages in *quantum meruit* is fundamentally an equitable claim of unjust enrichment[.]" *Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. Law Firm of Malone Middleman, P.C.*, ___ Pa. ___, ___, 179 A.3d 1093, 1102 (2018); *see also Shafer Elec. & Const. v. Mantia*, 626 Pa. 258, 264, 96 A.3d 989, 993 (2014) (noting *quantum meruit* is "a claim for unjust enrichment which implies a contract and requires the defendant to pay the

---

[9] As the matter proceeded in the trial court, the equitable claims became, in effect, the vehicle by which the court ultimately calculated the damages that would be due to Melmark if it had a viable basis for recovery. Specifically, the court computed the damages "in accordance with the rates stated in the joint stipulation[.]" *Melmark*, No. 13-001572, *slip op.* at 23. There is no dispute presently before this Court concerning that amount of damages, and hence, we do not address it.

We also note in passing that equitable relief is generally implicated only where no adequate remedy is available at law. *See Pechner, Dorfman, Wolffe, Rounick & Cabot v. Dep't of Ins.*, 499 Pa. 139, 144, 452 A.2d 230, 232 (1982). On the other hand, objections to equitable relief on such a basis generally must be made via preliminary objection, *see* Pa.R.C.P. 1028(a)(7), (8) – albeit we recognize that for parents to object preliminarily in this regard would have required them to take inconsistent positions. In view of the limited nature of the questions presently before this Court, we express no opinion as to the application of these precepts.

value of the benefit conferred" (internal quotation marks and citation omitted)). The party seeking recovery under this theory must demonstrate that it conferred benefits on the defendant, those benefits were appreciated by the defendant, and it would be inequitable for the defendant not to pay for them. *Meyer, Darragh*, ___ Pa. at ___, 179 A.3d at 1102 (quoting *Shafer*, 626 Pa. at 264, 96 A.3d at 993). "In determining if the doctrine applies, our focus is not on the intention of the parties, but rather on whether the defendant has been unjustly enriched." *Shafer*, 626 Pa. at 264, 96 A.3d at 993 (internal quotation marks and citation omitted).

As discussed, the trial court determined that, because Parents were not personally liable for the cost of Alex's residence and care at Melmark, they obtained no individual benefit from Melmark's provision of the same. Thus, in the court's view, Parents did not appreciate Melmark's services in their individual capacities, only in their capacities as Alex's guardians.

While one may certainly question the trial court's reduction of the "appreciation" element of a *quantum meruit* claim to personal liability for costs incurred,[10] our resolution of the choice-of-law issue vitiates the trial court's basis for concluding that Parents did not, in their individual capacity, appreciate Melmark's services. Further, in weighing the equities, we conclude that it would be inequitable for Parents to retain the benefits they received from Melmark without paying for them. Thus, Melmark has established all three prerequisites for its equitable claims. As such, and in answer to

---

[10] Our review of the record reveals that Parents appreciated Alex's placement and receipt of services at Melmark in their individual capacities. As Alex's parents, they cared a great deal about his welfare and wanted him to remain at Melmark. By refusing to take custody of Alex on March 31, 2012, Parents were able, for the next thirteen-and-one-half months, to visit him there regularly and to use Melmark as a base from which to provide Alex with additional opportunities (such as art and speech classes and equestrian therapy) at other locations in Pennsylvania.

the third question accepted for review, we hold that the Superior Court erred in finding that the trial court properly denied relief on Melmark's equitable claims.

## IV. Conclusion

For the reasons given, the order of the Superior Court is reversed and the matter is remanded to the trial court for further proceedings consistent with this opinion.

Justices Baer, Todd, Donohue, Dougherty, Wecht and Mundy join the opinion.