**[J-76-2025] [MO:Dougherty, J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**WESTERN DISTRICT**

| | | |
|---|---|---|
| IN THE INTEREST OF: G.G.B., A MINOR | : | No. 35 WAP 2024 |
| | : | |
| | : | Appeal from the Order of the |
| APPEAL OF: J.B., MOTHER | : | Superior Court entered September |
| | : | 25, 2024, at No. 1353 WDA 2023, |
| | : | Affirming the Order of the Court of |
| | : | Common Pleas Allegheny County |
| | : | Juvenile Division entered November |
| | : | 8, 2023, at No. CP-02-DP-0000410- |
| | : | 2023. |
| | : | |
| | : | ARGUED: October 7, 2025 |

**CONCURRING AND DISSENTING OPINION**

**JUSTICE MUNDY**                    **DECIDED: MARCH 26, 2026**

I join Part II(A) of the majority opinion, which concludes that the Allegheny County court had subject-matter jurisdiction.[1] Venue, as discussed in Part II(B), is the crux of this case. On that topic, I respectfully dissent from the majority's conclusion that venue was lacking anywhere in Pennsylvania, and in particular, in Allegheny County.

Under the Juvenile Act, venue is established at the outset of proceedings:

> **(b) Venue.**--A proceeding under this chapter may be commenced: (1) In the county in which the child resides. . . . (3) If dependency is alleged, in the county in which the child is present when it is commenced.

42 Pa.C.S. § 6321(b). This is also true under the Rules of Juvenile Court Procedure:

> **(A) Generally.**--A dependency proceeding shall be commenced in: (1) the county in which the child is present; or (2) the child's county of residence.

---

[1] I also join the majority in maintaining the status quo of G.G.B.'s placement and referring this matter to the Juvenile Court Procedural Rules Committee.

Pa.R.J.C.P. 1300(A).[2]  The closely-contested question herein is whether G.G.B. ("Child") "resided" anywhere other than the West Virginia hospital where she was born.

The majority proceeds by reference to the principles embodied in Pennsylvania Rule of Judicial Administration, *see* Pa.R.J.A. 108 ("Construction of Rules. Intent of Supreme Court Controls"), which mirror those of the Statutory Construction Act, *see* 1 Pa.C.S. § 1921.  The majority considers Rule of Juvenile Court Procedure 1300(A) clear and unambiguous that the parents' county of residence "plays no role" in ascertaining where a newborn resides.  Majority Op. at 25.  Thus, according to the majority, there is no need to construe the word "reside" or "residence."

As I read Rule 1300(A), it is not explicit on that point.  It says nothing about how to determine an infant's residence.  While it is true that only the child's residence is under consideration, the rule does not foreclose the possibility that the place where the parents live might, in some instances – such as a newborn still in the hospital – play a part in determining the infant's residence.  *See* Brief for Father at 6 (unnumbered) (urging this Court to clarify that a child's "residence" encompasses the parents' residence when the child has never had the opportunity to establish one); Brief for Mother at 17 (same).

Under Rule of Judicial Administration 108, when "the words of a rule are not explicit," this Court's intent may be determined by considering traditional statutory-construction factors, including the consequences of a particular interpretation and the object to be attained.  Pa.R.J.A. 108(c)(4), (6).  One of the assumptions this Court is directed to make is that we do not intend a result that is "absurd, impossible of execution, or unreasonable."  Pa.R.J.A. 109(a).  Another is that we intend rules to be "construed to

---

[2] To the extent Section 6321(b)(3) of the Judicial Code might otherwise be read to *limit* venue, where dependency is alleged, to the county where the child is present, it seems to me this Court has already interpreted 6321(b)(1) as also pertaining in those circumstances via our promulgation of Rule 1300(A).

secure the just, speedy, and inexpensive determination of every action or proceeding to which it is applicable." Pa.R.J.A. 109(b).

Where a statute defines "residence," that definition controls. *See Commonwealth v. Wilgus*, 40 A.3d 1201, 1208 (Pa. 2012). But where the text refers to a party's residence without defining the term, its meaning can depend upon the context and purpose of the statute. *See generally* 1 Pa.C.S. § 1921 (the purpose of interpreting statutes is to ascertain and effectuate the General Assembly's intent). In *Raymond v. Leishman*, 89 A. 791 (Pa. 1914), we explained that "[i]n ascertaining the meaning of the word 'residence' in a particular statute, the legislative purpose, as well as the context, must be kept in view," *id*. at 793, and we ultimately construed "residence" in the way most likely to effectuate the purposes of the statute in question. *See id*. at 793-95; *see also Willenbrock v. Rogers*, 255 F.2d 236, 237 (3d Cir. 1958) ("The words 'resident' and 'residence' have no precise legal meaning although they are favorite words of legislators. Sometimes they mean domicile plus physical presence; sometimes they mean domicile; sometimes they mean something less than domicile.").[3]

A North Carolina appellate court used this type of context-dependent reasoning in circumstances similar to those presented here. In *In re A.B.*, 635 S.E.2d 11 (N.C. App. 2006), the court ruled that a newborn who had not yet left the hospital resided in her parents' home for purposes of a statute designed to consider the risk to the remaining children when one child in a home has been abused or neglected. *See id*. at 15. In that matter the parents lived together, and their other children had been abused and

---

[3] Our explanation of the ordinary meaning of *residence* has at times been imprecise. We have distinguished it from *domicile* by pointing out it includes the place where the person is physically residing at the time. *See, e.g.*, *In re Residence Hearing Before Bd. of Sch. Dirs.*, 744 A.2d 1272, 1275 (Pa. 2000). But a person's residence cannot be *limited* to that one place, as we have also explained that a person can be a resident of more than one place simultaneously. *See Melmark, Inc. v. Schutt*, 206 A.3d 1096, 1102 n.4 (Pa. 2019) (quoting *Vento v. Dir. V.I. Bureau of Internal Revenue*, 715 F.3d 455, 467 (3d Cir. 2013)).

neglected. The court found the newborn infant "lived in" the family home to which the parents intended to bring her from the hospital. Such interpretation helped effectuate the statute's underlying purpose to protect vulnerable children. *See id*. (holding the statutory language did not require finding that the child resided in the home "in the most literal meaning of that term," where placing the child there following her hospital stay "would subject [her] to substantial risk, contrary to the purposes of the statute").

The facts of the instant case illustrate why such a reading comports with the purpose of Rule 1300(A) and the Juvenile Act. I do not believe this Court, in promulgating that rule, intended to allow parents to circumvent the involvement of children and youth via the type of strategic behavior the parents engaged in here.

Even apart from strategic conduct, it is easy to imagine a mother giving birth in a hospital located in a county adjacent to her home county, and then the mother being discharged while the infant remains at the hospital for treatment.[4] This is likely where the closest hospital is over the county line, which will often be true for parents who live near that line or live in rural areas. The same applies where the closest hospital is over the state line, which, again, is not unusual. And mothers sometimes give birth unexpectedly during out-of-state travel. Alternatively, if the mother gives birth in a hospital in her home county, and then medical problems arise, the infant might be transferred to an out-of-county hospital with better equipment and capabilities. I doubt this Court intended to divest the original county's children and youth agency of authorization to commence dependency proceedings in all of these situations, particularly where that agency is

---

[4] It is also possible for the mother to die in childbirth. While maternal deaths during childbirth are uncommon, they do sometimes occur. According to the Centers for Disease Control and Prevention, in the United States there were, on average, around 22 annual maternal deaths per 100,000 births during the years 2018-2023. *See* Donna L. Hoyert, *Maternal mortality rates in the United States, 2023*, at 7 (NCHS Health E-Stats 2025), viewable at https://dx.doi.org/10.15620/cdc/174577 (accessed Feb. 4, 2026).

already familiar with the family and its circumstances.[5]  If all parties know a newborn is in another county due solely to the happenstance of the hospital's location, and they all intend for her to be brought home by the parents, the purposes of the Juvenile Act can be effectuated in a "just, speedy, and inexpensive" way, Pa.R.J.A. 109(b), if the court in the parents' home county has venue to rule on a dependency petition.  *See generally Minetree v. Minetree*, 26 S.W.2d 101, 104 (Ark. 1930) ("[T]he domicile of every person at his birth is the domicile of the person on whom he is legally dependent, whether it is at the place of birth or elsewhere.") (internal quotation marks and citation omitted).  These purposes include preserving family unity whenever possible.  *See* 42 Pa.C.S. § 6301(b)(1).

Finally, this reading is not inconsistent with our precedent, as we have in other situations deemed an infant's residence to be that of its parents.  In *Petition of Wagner*, 112 A.2d 352 (Pa. 1955), an adoption petition was filed in the orphans' court of Chester County pursuant to a Pennsylvania statute that conferred jurisdiction on the court where the prospective adoptee "is a resident."  In that matter, a newborn infant resided with her mother in Chester County.  The father abandoned both mother and infant and moved to Florida.  The mother, now indigent, moved around, staying at temporary locations in Maryland and Delaware, and then died in an automobile accident, whereupon relatives living in Baltimore sought to adopt the baby.  The biological father challenged the court's jurisdiction, arguing the infant was no longer a resident of Chester County.  We disagreed, affirming that the child's domicile and residence – terms we used interchangeably – was the last place the mother had established a permanent residence:

---

[5] Under prevailing Pennsylvania law not challenged herein, the common pleas court in the county where the newborn is located has no authority over the children and youth agency of any other county.  *See In re G.B.*, 530 A.2d 496, 498 (Pa. Super. 1987).

> The domicile of an infant is established by the acts and intention of the one who is entitled to the custody and control thereof. This doctrine means no more ordinarily than that the residence of the infant is that of its father, mother, or other natural guardian.

*Id*. at 354-55. Thus, when discerning the infant's residence in *Wagner*, we relied on the mother's actions and intentions. The principle reflected in that case is that the residence of a child follows that of the parent, which would logically apply *a fortiori* to all newborns as they cannot themselves form intentions about where to live.[6]

In this regard, statutory references to residence are often understood to exclude mere temporary habitations from which a person intends to depart within a relatively short timeframe.[7] In the present case, Child was placed in the NICU of a hospital in West Virginia shortly after birth. However, there is no suggestion the hospital was intended to be Child's long-term residence; rather, she was intended to leave the NICU and go home when medically advisable. In this situation, failing to impute the parents' residence to the newborn infant leaves the infant with no residence at all, which seems like the type of result we would prefer to avoid. *See* Pa.R.J.A 109(a) (reflecting that this Court does not intend results that are unreasonable or impossible of execution); *cf. Hall v. Wake Cnty. Bd. of Elections*, 187 S.E.2d 52, 57 (N.C. 1972) ("The law permits no individual to be without a domicile. At birth he takes the domicile of the person upon whom he is legally dependent."). *See generally In re G.G.B.*, No. 1353 WDA 2023, 2024 WL 4285756, at *6

---

[6] A number of our sister states have expressed that unemancipated minors, being *non sui juris*, cannot acquire or change their domicile or legal residence of their own volition. *See Minetree v. Minetree*, 26 S.W.2d 101, 104 (Ark. 1930); *Glos v. Sankey*, 36 N.E. 628, 633 (Ill. 1893); *Thompson v. Miss. Farm Bur. Mut. Ins. Co.*, 602 So.2d 855, 857 (Miss. 1992); *In re Hall's Guardianship*, 71 S.E.2d 140, 143 (N.C. 1952); *Cribbs v. Floyd*, 199 S.E. 677, 681 (S.C. 1938); *Bonneau v. Russel*, 85 A.2d 569, 570 (Vt. 1952).

[7] *See Interest of J.S.M.*, 514 A.2d 899, 900 (Pa. Super. 1986) (reciting that residence is commonly defined as a person's "presence at some place of abode *with no present intention of definite and early removal* and with purpose to remain for undetermined period") (emphasis added) (quoting Black's Law Dictionary 1176 (5th ed. 1979)); *Hawkins v. Pa. Housing Fin. Agency*, 595 A.2d 712, 714 (Pa. Cmwlth. 1991) (same).

(Pa. Super. Sept. 25, 2024) (Kunselman, J., concurring) (expressing that leaving a newborn with no residence will cause difficulties for the many infants across Pennsylvania who test positive for illegal drugs at birth and whose dependency proceedings begin shortly thereafter).

This is not to say the children and youth agency in the county where the hospital is located cannot commence proceedings, as Rule 1300(A)(1) allows for venue where the child is physically present. But the West Virginia agency did not do so, and my point here is that under Rule 1300(A)(2) the agency located in either county where the parents resided at the time of birth was, I believe, also authorized to commence proceedings. *Accord* Brief for Child at 9-10.

Accordingly, I respectfully dissent from the majority's holding in Part II(B) that venue was absent anywhere in Pennsylvania when Child was born. As I believe venue was present in Allegheny County at the time proceedings began, I would affirm the order of the Superior Court. I recognize Father had rejoined Mother in Fayette County by the time the October 2023 adjudicatory hearing took place. That factor is relevant to Mother's motion to transfer, not to whether venue existed in Allegheny County when litigation began – which is the only issue presently before us. In this respect, much of the briefing we have received is devoted to choosing between the counties of the parents' residence at the time of Child's birth by reference to factors listed in Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA). *See* 23 Pa.C.S. § 5427(b).[8] However, both 42 Pa.C.S. § 6321(b) and Pa.R.J.C.P. 1300(A) are permissive in allowing proceedings to commence in any county where the infant legally resides. Thus, even if one county would be a "better" forum than the other, it does not follow that venue *only* exists in that county. The UCCJEA factors may become relevant during future rulemaking by this Court.

---

[8] The UCCJEA is reposited as Chapter 54 of the Domestic Relations Code.